# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-00083 (DLF)** |
| **v.** | : | |
| | : | |
| **PATRICK WOEHL,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Following a bench trial, the Court convicted defendant Patrick Woehl of four crimes: (a) Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (b) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (c) Disorderly or Disruptive Conduct on the Grounds or in the Buildings of the United States Capitol, in violation of 40 U.S.C. § 5104(e)(2)(D); and (d) Parading, Demonstrating, or Picketing in any Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

For the reasons set forth herein, the government requests that this Court sentence Woehl to twelve months' incarceration on Counts One and Two to be served concurrently with six months' incarceration on Counts Three and Four, followed by one year of supervised release. The government also requests that this Court impose 60 hours of community service, and $500 in restitution.

1

## I.      Introduction

Woehl, a 54-year-old former audio production engineer, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Woehl was convicted at trial of violations of 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). The government's recommendation is supported by the following facts: (1) before entering the Capitol, Woehl was aware of the violence and chaos occurring on the restricted Capitol grounds, including feeling the effects of tear gas and watching rioters overrun a line of officers, (2) Woehl remained in the Capitol for over 25 minutes and went to particularly sensitive areas, including the Speaker's Suite of Offices, where he tried to open two unlocked doors and go onto the Speaker's Balcony and (3) provided misleading testimony under oath at trial.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions

_____

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Woehl's crime support a sentence of 12 months' incarceration in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Complaint Affidavit, ECF No. 1.

### *Woehl's Role in the January 6, 2021 Attack on the Capitol*

Woehl traveled to Washington, D.C., from California and, on January 6, 2021, Woehl attended the former President's "Stop the Steal" rally by the Ellipse. After the former President's speech, Woehl walked down Pennsylvania Avenue towards the Capitol. While walking, and near the intersection of Pennsylvania Avenue and 6th Street NW, nearly a half mile from the Capitol, an unknown male told Woehl that there was fighting at the Capitol and that people were fighting with police and pushing through the barricades. Woehl responded, "they are?" and "wow." (Exhibit 202, at 00:20-00:28; *see also*, Exhibit 304, at 00:30 (Woehl stating "I'm hearing they're breaking down the barricades.").) After hearing of violence at the Capitol, Woehl continued walking down Pennsylvania Avenue.

As Woehl approached the Peace Circle, he heard flash bangs that police were deploying and was aware that police were "launching the pepper spray." (Exhibit 305, at 2:10-2:12.) He also described the scene as "chilling" and said that it was "time to gear up." (Exhibit 305, at 1:55-2:00, 2:12-2:17.) As he got closer to the Capitol building, Woehl stated "there's flash bangs and people getting pepper sprayed." (Exhibit 306, at 00:17-00:21; *see also* Exhibit 307, at 00:25-00:30.) From the West Lawn of the Capitol, Woehl filmed rioters overwhelming Capitol Police on a set of stairs leading up to the Upper West Terrace. (Exhibit 307, at 1:33-1:55.)



*Image 1: Screenshot from Exhibit 307 at 1:33 showing rioters overwhelming officers*

Woehl yelled, "take your house," "they can't stop us," "get the hell out," "you're all traitors," "you're traitors," and "get out of our house, traitors!" (Exhibit 307, at 00:26-1:08.) Woehl cheered as rioters ultimately overwhelmed the police and overran the stairs. (Exhibit 307, at 1:33-1:55.)

Again, despite all the signs of violence and disruption—the smell of various chemical sprays, the cries and chants of the mob—Woehl continued to advance towards the Capitol building. Before climbing through scaffolding, Woehl stated, "We're storming the Congress. Uh, this is getting hairy." (Exhibit 300, at 00:20-00:28.) While in the scaffolding, Woehl yelled, "keep pushing," and "this is a revolution." (Exhibit 300, at 1:22-1:28.) As he climbed the stairs to the Upper West Terrace, Woehl said, "the pepper spray is pretty intense." (Exhibit 300, at 2:56-3:02.)

And, as he got to the Upper West Terrace, Woehl announced his intention: "we're taking it." (Exhibit 300, 3:20-.3:22.)

As he neared the Senate Wing Door, Woehl yelled, "traitor," and "get the hell out of our way!" (Exhibit 300, at 4:19-4:23.) He saw a line of officers in riot gear protecting another entry to the Capitol. (*See*, Exhibit 300, at 4:23.) Woehl initially walked up the ramp towards the Senate Wing Door but retreated while announcing "they're spraying pepper spray." (*See* Exhibit 300, at 4:38-5:27.)

Woehl then reapproached the Senate Wing Door. (Exhibit 300, at 6:16-6:50.) He saw people climbing into the Capitol through a broken window and commented, "oh my God, the window's broken" as he approached the Senate Wing Door. (Exhibit 300, at 6:37-6:50.)



*Images 2 and 3: Screenshots from Exhibit 300 showing people climbing through a broken window (Image 2, at 6:38) and the broken Senate Wing Door (Image 3, at 6:48)*

At approximately 2:23 p.m., Woehl walked into the U.S. Capitol through the badly damaged Senate Wing Door.



*Image 4: Screenshot from Exhibit 202 at 00:30 showing Woehl entering the Capitol through the Senate Wing Door*

After walking through the badly damaged Senate Wing Door, Woehl walked south towards the Capitol's Crypt. While walking down the hallway, Woehl joined a chant of "USA" and said, "Nancy, where are you?" (Exhibit 300, at 7:05-7:37.) Woehl briefly walked towards the old Supreme Court before entering the Capitol's Crypt. While in the Crypt, Woehl said, "this is a revolution. This is what you caused. You don't cheat and steal our votes and expect, expect nothing. We're taking it." (Exhibit 300, at 9:24-9:40.) He also yelled, "push it" and "keep going." (Exhibit 300, at 10:50-11:03.)

Woehl continued through the Crypt and to a set of stairs near the Memorial Door. At the bottom of the stairs, Woehl stopped to pull up his neck gator to cover his nose and mouth to protect himself from the effects of chemical spray in the air. (Exhibit 300, at 14:00-14:27.) Woehl continued up the staircase, briefly looked into the Rotunda, and then entered the Speaker's Suite of Offices. The area was clearly labeled with a sign that read "Speaker of the House Nancy Pelosi." (Exhibit 300, at 15:26.)



*Image 5: Screenshot from Exhibit 300 at 15:28 showing*
*what Woehl saw before entering the Speaker's Suite of Offices*

In the Speaker's Suite of Offices, people around Woehl were yelling things like, "Nancy Pelosi, where are you?" and "where are you hiding? Where are you hiding, Nancy?" (Exhibit 300, at 15:30-16:27.)  Woehl said, "Nancy, I have some ice cream for you."  (Exhibit 300, at 15:41-15:48.)  While in the Speaker's Suite of Offices, Woehl attempted to open two locked doors. (Exhibit 300, at 16:10-16:41.)



*Image 6 (left): Screenshot from Exhibit 300 at 16:12 showing Woehl attempting to open a locked door in the Speaker's Suite of Offices*

*Image 7 (right): Screenshot from Exhibit 207 at 00:20 showing Woehl attempting to open a second locked door in the Speaker's Suite of Offices*

At the same time Woehl attempted to open locked doors, congressional staffers were hiding in a conference room in the Speaker's Office suite.[2]  Henry Connelly, head of communications for House Speaker Nancy Pelosi, recalled that staffers barricaded themselves in a nearby conference room while rioters occupied other offices in the suite. Connelly recalled, "We were huddled in the dark, listening to the screams of people trying to find our boss." Leah Han, another Pelosi staffer

---

[2] *See* Jazmine Ulloa, *'I didn't think I was going to go home that day': Congressional staffers recall the lingering trauma of the Jan. 6 attack*, The Boston Globe, available at: https://www.bostonglobe.com/2022/01/04/nation/behind-scenes-scene-crime-congressional-staffers-recall-lingering-trauma-jan-6-attack/

recalled staffers crouching under a table as the protestors entered the Speaker's Office suite: "I was thinking, 'If they find us are they going to keep us hostage? Are they going to . . . torture us? . . . Am I going to get raped? . . . Am I going to get shot? Do they have weapons?' I didn't think I was going to go home that day." *Id.*

Woehl then went into the Speaker's Office. While there, one rioter said, "I can't believe we just fucking did this." (Exhibit 300, at 17-06-17:10.) Woehl responded, "I know." (Exhibit 300, at 17:06-17:10.)

Next, Woehl went out onto the Speaker's Balcony, which was covered in scaffolding for the upcoming Presidential inauguration. While on the balcony, Woehl looked out at the West side of the Capitol and commented on the size of the crowd. He also commented, "they're launching flash bangs and pepper spray bombs and everything." (Exhibit 300, at 18:24-18:54.)

He then climbed up a ladder onto the scaffolding (though attempted to minimize the extent of his intrusion by testifying that he climbed stairs or steps) and continued to watch the scene on the West side of the Capitol. He also said, "we're going to take our country back. We did it in 1776, and we can do it in two thousand 21." (Exhibit 300, at 21:25-21:35.) He also said, "I said I always wanted to see Congress, but I wasn't expecting to get an in person tour, self-guided tour" and laughed. (Exhibit 300, 22:27-22:39.)

While there, he saw a line of officers down below and watched a rioter approach the line. (Exhibit 300. 22:50-23:52.) Woehl said, "they're going to storm it," and the "line is about to fall. One guy. That's a Tiananmen Square moment. He needs some back up. Come on people. Back him up. Go in. Back him up. Back him up. It's our house. Take it. Take it. Not that I'm trying to incite violence or anything but this is a bunch of BS. We're tired of it, so this is what happens."

(Exhibit 300, at 22:50-23:52.) Shortly after this, Woehl said, "come on in, I'll put some coffee on for you guys." (Exhibit 300, at 24:36-24:43.)

A Capitol Police Officer told Woehl that he needed to get off the scaffolding, and Woehl went back inside the Capitol. He asked another officer, "how do I get out" and "you can't cheat the people, this is what happens." (Exhibit 300, at 26:13-26:31.) Despite asking the officer about how to get out, Woehl remained inside the Capitol for over six more minutes. The officer directed Woehl through the Rotunda, so Woehl walked through the Rotunda and approached the East Doors at approximately 2:45 pm. An alarm was blaring near the door. From there, Woehl turned around and went back into the Rotunda. After spending five more minutes in the Rotunda, Woehl walked back to the East Doors and exited the building at 2:50 pm.

When Woehl exited the Capitol, he said, "Another shot of pepper spray. I think I'm building up an immunity. It's herd immunity. At least we're all getting herd immunity." (Exhibit 308, at 00:46-00:58.) He then said, "I want to know what Pence has done or is doing." (Exhibit 308, at 1:10-1:15.)

*Woehl's Statements After January 6*

On January 12, 2021, Woehl texted an acquaintance: "hey bro. got banned from FB and messenger. Doing good. Was at ground zero last week. info from media is ALL lies." On June 16, 2022, Woehl sent the following message:

> FBI shows up at church looking for me. They want to "talk" about my involvement in the "insurrection". More BS. They know I have video that shows the Feds involvement. They are using facial recognition just like China.

Woehl followed that up with, "Yeah. I was advised to not meet with them anymore. Hopefully it just goes away. I think they want me to say 'Trump made me do it.' Ain't happening Feds."

*Woehl's Trial Testimony*

Woehl testified at trial and, on some critical points, attempted to minimize his conduct and was not entirely candid. Woehl, for example, testified that he did not see rioters overwhelm officers on the Northwest Stairs. But Woehl focused his cellphone's camera on the officers while recording.  (See, *image 1*, above.) He also cheered when rioters overwhelmed the officers.

As he neared the Senate Wing Door, Woehl yelled, "traitor," and "get the hell out of our way." (Exhibit 300, at 4:19-4:23.)  He saw a line of officers in riot gear protecting another entry to the Capitol.  (*See*, Exhibit 300, at 4:23.) At trial, he testified that he understood this to mean that he could not enter the Capitol through the door the officers were blocking but was permitted to enter the Capitol through the broken open Senate Wing Door. This portion of Woehl's testimony was false.  First, it is clear in the video that Woehl was directing his chants of "traitor" and "get the hell out of our way" to that line of officers—as he yells "get the hell out of our way," he turns the focus of his phone to record the line of officers.



*Image 8: Screenshot from Exhibit 207 at 04:24 showing officers in the Upper West Terrace while Woehl screamed "get the hell out of our way"*

Moreover, the video shows that when Woehl first began walking on the ramp towards the Senate Wing Door, he retreated while announcing "they're spraying pepper spray." (*See* Exhibit 300, at 4:38-5:27.) In addition, everything that occurred before Woehl approached the Upper West Terrace—including his knowledge that police were deploying chemical irritants and flash bangs, and watching rioters overrun a line of officers on the Northwest stairs—made it obvious that Woehl was not supposed to enter the building. The language Woehl used while approaching the Capitol— including "we're storming the Congress" and "we're taking it"— as well as the obvious damage to the windows and door also demonstrates that he knew that the Senate Wing Door was not open for the crowd.

While in the Speaker's Suite of Offices, Woehl attempted to open two locked doors. (Exhibit 300, at 16:10-16:41.)  But Woehl testified that he attempted to open one locked door and

was not sure if he tried to open the other door.  According to Woehl, he could not tell who tried to open the locked door recorded in his cellphone video because the hand was gloved.  Woehl's initial testimony on this point was false and an attempt to minimize his conduct.  On cross examination, Woehl admitted that the gloves were his and that he did, indeed, try to open both locked doors.  Woehl stipulated that he recorded the video introduced as Government's Exhibit 300. (Exhibit 501, at 2.)  It is plain from the video that the person holding the cellphone was the individual who tried to open the locked doors.  In addition, the footage showed the hand that tried to open the door.  The person was wearing Woehl's gloves and holding a water bottle that Woehl picked up while on the Upper West Terrace, before entering the Capitol.

*Woehl's Convictions*

On February 15, 2024, the United States charged Woehl by a four-count Information with violating 18 U.S.C. § 1752(a)(1) (Count One), 18 U.S.C. § 1752(a)(2) (Count Two), 40 U.S.C. § 5104(e)(2)(D) (Count Three), and 40 U.S.C. § 5104(e)(2)(D) (Count Four). Following a bench trial, the Court found Woehl guilty of all four counts.

**III.   Statutory Penalties**

Woehl now faces a sentencing for violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), 40 U.S.C. § 5104(e)(2)(D) (Disorderly or Disruptive Conduct on Capitol Grounds or in any of the Capitol Buildings), and 40 U.S.C. § 5104(e)(2)(D) (Parading, Demonstrating, or Picketing in any of the Capitol Buildings).  As noted in the PSR, Woehl faces up to one year of imprisonment and a fine of up to $100,000 on Counts One and Two, and up to six months of imprisonment and a fine of up to $5,000 on Counts Three

and Four. The Court may also order Woehl to pay restitution. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.     The Sentencing Guidelines and Guidelines Analysis

Because the two § 1752 offenses are Class A Misdemeanors, the Sentencing Guidelines apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9. The Sentencing Guidelines do not apply to the § 5104 offenses, however, because they are both Class B Misdemeanors. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR, and Counts One and Two are grouped for guideline calculation purposes. The guideline calculation is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4(a)) | +10 |
| Obstruction (U.S.S.G. § 3C1.1) | +2 |
| Adjustment (U.S.S.G. § 4C1.1) | -2 |
| Total Adjusted Offense Level | 10 |

*See* PSR at ¶¶ 60-68.

Under U.S.S.G. §3C1.1, the offense level is increased by two levels when the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice

with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and the obstructive conduct related to the "offense of conviction and any relevant conduct." This enhancement includes false testimony at trial, so long as such testimony is material, U.S.S.G. § 3C1.1 cmt. 4(B); but it is not intended to punish the defendant for the exercise of a constitutional right or his denial of guilt. *Id.* cmt. 2.

The D.C. Circuit recently considered the application of this guideline in the context of a January 6 case in *United States v. Alford*, No. 23-3023, 2024 WL 57356 (D.C. Cir. Jan. 5, 2024). In *Alford*, the defendant received a two-level sentencing enhancement under 3C1.1 when he provided "misleading testimony at trial." The Court affirmed the application of the enhancement even though the defendant's testimony fell "short of deliberate falsehoods" because it was "disingenuous and not entirely candid or truthful." *Alford*, 2024 WL 57356 at *7.

In *Alford*, the defendant testified that he traveled to D.C. to "enjoy [himself], take some pictures, enjoy some like-minded people." *Id.* at 7 n. 5. The defendant "also claimed not to notice the signs and barricades restricting access to the Capitol and claimed not to know that he was not allowed inside." *Id.* In addition, the defendant testified that, "once in the Capitol, he was just 'being a sightseer in D.C.'" *Id.* The enhancement applied because the defendant's testimony was "disingenuous and not entirely candid or truthful." *Alford*, 2024 WL 57356 at *7.

Woehl's testimony mirrors the defendant's misleading testimony in *Alford*. He testified that he thought he could enter the Capitol through the Senate Wing Door, despite being aware that police were deploying chemical irritants and flash bangs, despite seeing rioters overwhelm officers on the Northwest stairs, despite seeing broken windows and doors, and despite exclaiming that he was "storming the Congress." He also attempted to minimize his conduct by testifying that he did not know who attempted to unlock one door in Speaker Pelosi's suite of offices, despite the clear

video evidence showing that it was Woehl who attempted to open that locked door. Like the defendant in *Alford*, Woehl's testimony on these critical points was "disingenuous and not entirely candid or truthful."  The Probation Office correctly applied a two-level enhancement under 3C1.1.

While the Government concedes that Section 4C1.1 applies to Woehl, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because Woehl's presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that Woehl's in fact impeded or disrupted the orderly conduct of Government business or official functions").  Thus the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available

at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications for criminal activity have gone mainstream.").

The U.S. Probation Office calculated Woehl's criminal history as a category I. PSR at ¶ 71. Accordingly, the U.S. Probation Office calculated Woehl's total adjusted offense level at 10, and his corresponding Guidelines imprisonment range at 6-12 months. PSR at ¶¶ 125-126. However, if the requested two-level upward variance is applied, Woehl's total adjusted offense level would be 12, and his corresponding Guidelines imprisonment range at 10-16 months. The government's recommendation of 12 months' imprisonment is in the middle of that guideline range.

## V.       Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 12 months of incarceration followed by a term of supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Woehl's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Woehl, the absence of violent or destructive acts is not a mitigating factor. Had Woehl engaged in such conduct, he would have faced additional criminal charges.

An aggravating factor in Woehl's case is his focus on searching for Speaker Pelosi. Almost immediately upon entering the Capitol, Woehl said, "Nancy, where are you?." He then went to Speaker Pelosi's clearly labeled Suite of Offices, where he said, "Nancy, I have some ice cream for you." And, while there, he tried to open two locked doors. Woehl did this while the crowd around him screamed vulgar and violent threats against Speaker Pelosi and while Speaker Pelosi's terrified staff was hiding in barricaded offices in the Speaker's suite. This conduct was threatening and warrants the government's recommended sentence. *See, United States v. Ericson,* 21-cr-506 (TNM), Tr. 12/21/21, at 21 ("That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it.").

Accordingly, the nature and circumstances of this offense establish the clear need for a sentence of 12 months' incarceration in this matter.

### B. Woehl's History and Characteristics

As set forth in the PSR, Woehl has one 1989 conviction for petty theft and several traffic violations. PSR at ¶¶ 70-71. Woehl previously worked in the information technology industry, and most recently worked part time as an audio production engineer. PSR at ¶¶ 106-109. He is currently unemployed and has been receiving social security disability benefits since 2013. PSR at ¶¶ 106-107.

Woehl reported that he broke his neck in a surfing accident in 2003 and suffered approximately 12 strokes and had an aortic valve replacement in 2013. PSR at ¶¶ 87-88. He also reported that he is "looking to have a heart transplant soon." PSR at ¶ 788. Because Woehl has not provided a medical release to the Probation Office, Woehl's reported medical history is unverified. But even if accurate, Woehl's prior health issues did not deter him from engaging in illegal conduct on January 6.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

19

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Woehl has not accepted responsibility for his criminal conduct; nor has he shown any remorse. He initially gave false accounts of what occurred to friends, saying "info from the media is ALL lies" and "[t]ey know I have video that shows the Feds involvement." Even at trial, Woehl claimed he believed he could enter the building, despite being fully aware that rioters were attacking police, seeing other rioters climb through a broken window, feeling the effects of pepper spray, and commenting on the broken Senate Wing Door. Indeed, during his testimony, he provided misleading testimony under oath and continued to minimize his conduct. Woehl presents a risk of repeating his conduct in the future if he is faced with a political outcome he does not support.

A term of imprisonment is important to specifically deter Woehl from any such future

crimes, to impress upon him the gravity of his crimes, and to promote respect for the law.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[3] This Court must sentence Woehl based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Woehl was convicted of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104I(2)(D) and (G). The offenses are a Class A and B misdemeanors. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Chambers*, 23-cr-300 (DLF), Chambers, like Woehl, approached the Capitol from the West, and saw the chaos on the West Plaza. Both Chambers and Woehl knew police were deploying chemical irritants to defend themselves against the attacking rioters.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Chambers helped move a large, metal sign toward a line of officers; other rioters eventually shoved that sign towards the police line. Chambers then went to the East side of the Capitol, where he saw members of the mob rip away an officer's shield and separate that officer from the police line and the door. After about 40 minutes near the door, Chambers entered the building until he was pushed out by officers a few minutes later. Before trial, he told a friend not to talk about his involvement in the riot to police. At trial, Chambers testified falsely regarding multiple material facts, including saying he did not see Area Closed signs and was unaware of violence occurring at the Capitol. Chambers faced a guidelines range of 10 to 16 months' imprisonment as his criminal history rendered him ineligible for a reduction under 4C1.1. The Court sentenced Chambers to seven months of imprisonment on two § 1752 counts to be served concurrently with six months of imprisonment on two § 5104 counts, followed by 12 months of supervised release.

Like Chambers, Woehl was aware of the chaos and violence at the Capitol before deciding to enter the building. And, like Chambers, Woehl testified falsely regarding multiple material facts at trial, and both displayed a lack of remorse. Though Woehl did not help pass an object ultimately used to assault police (a large metal sign), Woehl spent a significantly longer time inside the Capitol, Woehl went to particularly sensitive areas of the Capitol and engaged in threatening behavior in the Speaker's Suite of Offices. As such, Woehl's conduct deserves a longer sentence than the Court imposed in Chambers.

Other judges of this court have sentenced Capitol breach defendants with consideration to the sensitivity of the locations they reached within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, created more acute security risks and places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space

took an extra step to occupy the Capitol, displace Congress, and display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.  A few cases highlight sentencings in cases involving a defendant's entry into a sensitive space.

Other defendants who testified falsely at trial have received incarcerative sentences. In *United States v. Alford*, 21-cr-263 (TSC), Alford entered the Capitol through the Upper House door and ignored police commands to leave the building. Then, as other police were attempting to expel rioters from the, Alford stood inside the door and watched police force other rioters out of the building. After the riot, Alford publicly posted about the riot and mocked law enforcement officers who dealt with rioters. Alford's trial testimony contained material misstatements, including that he was lost while looking for an exit, and the court applied a two-level enhancement for obstruction. Alford was convicted of the same crimes as Woehl and the court sentenced Alford to twelve months of imprisonment on two § 1752 counts to be served concurrently with six months of imprisonment on two § 5104 counts.

In *United States v. Nester*, 22-cr-138 (TSC), Nester entered the Capitol through the Rotunda Door and remained inside the Capitol for about 10 minutes. Like Woehl, Nester was aware that rioters were fighting with police. At trial, Nester falsely testified that he believed he had a right to enter the Capitol. The court sentenced Nester to ten months of imprisonment on two § 1752 counts to be served concurrently with six months of imprisonment on two § 5104 counts. Like Nester, Woehl testified falsely at trial.  But Woehl also attempted to enter two locked rooms

in Speaker Pelosi's suite of offices and remained on the Speaker's Balcony for an extended period. As such, a lengthier sentence is required for Woehl than the sentences imposed in *Nester*.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110

Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Woehl was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of

full restitution without respect to a defendant's ability to pay.[4]

Because Woehl engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Woehl to pay $500 in restitution for his convictions on Counts One and Two. This amount fairly reflects Woehl's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into

---

[4] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Fine

Woehl's convictions subject him to a statutory maximum fine of $100,000 on Counts One and Two and a statutory maximum fine of $5,000 on Counts Three and Four. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Woehl has not shown an inability to pay because he failed to provide the Probation Office with a signed financial statement with supporting documents and failed to return a signed consent form authorizing the release of his financial information. Thus, under the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4,000 to $40,000. U.S.S.G. § 5E1.2(c).

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Woehl to twelve months' incarceration on Counts One and Two to be served concurrently with six months' incarceration on Counts Three and Four, followed by one year of supervised release. The government also requests that this Court impose 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Woehl's liberty because of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/ Anna Z. Krasinski
ANNA Z. KRASINSKI
Assistant United States Attorney
New Hampshire Bar No. 276778
United States Attorney's Office
Detailed from the District of New Hampshire
(603) 451-7851
anna.krasinski@usdoj.gov

/s/ Matthew Beckwith
MATTHEW BECKWITH
DC Bar No: 90014452
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20004
(202) 252-7109
Matthew.Beckwith@usdoj.gov